UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES RETIREMENT SYSTEM and FRANK E. WATERS, on Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) | No. 1:12-cv-01750-PAG<br><br>CLASS ACTION |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| COOPER INDUSTRIES PLC, KIRK S. HACHIGIAN, GERALD B. SMITH, LINDA A. HILL, DAN F. SMITH, STEPHEN G. BUTLER, IVOR J. EVANS, JAMES J. POSTL, LAWRENCE D. KINGSLEY, MARK S. THOMPSON, EATON CORPORATION, ABEIRON LIMITED, COMDELL LIMITED, TURLOCK B. V. and TURLOCK CORPORATION, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

AMENDED COMPLAINT FOR VIOLATIONS OF
THE SECURITIES EXCHANGE ACT OF 1934 AND OPPRESSION

## SUMMARY OF THE ACTION

1.      Plaintiffs bring this shareholder class action both for themselves and on behalf of all similarly situated holders of the common stock of Cooper Industries plc ("Cooper" or the "Company") against Cooper, the members of Cooper's Board of Directors (the "Board"), Eaton Corporation ("Eaton"), Abeiron Limited ("Abeiron"), Comdell Limited ("Comdell"), Turlock B.V. ("TBV"), and Turlock Corporation ("Turlock").  This action arises out of defendants' violations of Irish corporate law and Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder.  These violations arise in connection with defendants' attempts to sell Cooper to Eaton at an unfair price of $72 per share via an unfair process (the "Proposed Acquisition").  Further, as part of their efforts to seek shareholder approval of the Proposed Acquisition, the defendants have filed with the SEC a false and materially misleading Form S-4 Registration Statement which included a Preliminary Joint Proxy Statement (the "Proxy").

2.      Under the laws of Ireland, the directors of a publicly traded corporation must avoid conducting any affairs of a company in a manner which is oppressive to a shareholder, or which disregards the interests of a shareholder.  In pursuing the unlawful plan to sell the Company via an unfair process and at an unfair price, the Individual Defendants (as defined herein) violated Irish corporate law.  Moreover, each of the defendants violated the federal securities laws by attempting to facilitate the Proposed Acquisition without fully disclosing all material information.  This action seeks to enjoin the Individual Defendants from oppressing the Company's shareholders in connection with the Proposed Acquisition and from seeking shareholder approval of the Proposed Acquisition without disclosing all material information in the Proxy to Cooper shareholders in violation of Sections 14(a) and 20(a) of the Exchange Act.

3.      Cooper is a global electrical products manufacturer with 2011 revenues of $5.4 billion.  Founded in 1833, the Company has seven operating divisions, including Bussmann electrical and electronic fuses; Crouse-Hinds and CEAG explosion-proof electrical equipment; Halo and Metalux lighting fixtures; and Kyle and McGraw-Edison power systems products. With this broad range of products, Cooper is positioned for several long-term growth trends, including the global infrastructure build-out, the need to improve the reliability and productivity of the electric grid, the demand for higher energy-efficient products and the need for improved electrical safety.

4.      Accordingly, prior to the Proposed Acquisition, Cooper maintained robust and profitable growth.  Cooper beat earnings estimates in each of the last four quarters and in eight of the last nine quarters.  Moreover, Cooper beat revenue estimates in each of the last eight quarters. Defendant Kirk S. Hachigian ("Hachigian"), Cooper's Chairman of the Board and Chief Executive Officer ("CEO"), acknowledged the Company's record success, stating, "***Our Company-wide strategic initiatives and proven business model now have delivered eight quarters of double-digit earnings per share growth.  Our new product vitality, which represents revenues from sales of products developed in the last three years, was a record 29% of total revenue and our percentage of sales derived from outside the United States reached a record 40%***."

5.      On May 21, 2012, however, the Board brought this sustained and substantial growth potential for the Company's shareholders to a halt when the Company announced that it had entered into the Proposed Acquisition to sell Cooper to Eaton.  Under the terms of the Proposed Acquisition, Eaton will acquire all of the outstanding shares of Cooper for $72 per share, consisting of cash and stock, for a total value of $11.8 billion.

6.      The Board acted in an oppressive manner when it failed to maximize shareholder value. The Proposed Acquisition represents a mere 29% premium to the price at which Cooper stock was trading just prior to the announcement of the Proposed Acquisition.  The $72 per share proposal

was below numerous analysts' valuation of Cooper stock, and the 29% premium fell substantially below previous comparable transactions in the same sector over the past five years.

7.      Moreover, the Board agreed to preclusive deal protection devices in connection with the Transaction Agreement entered into on May 21, 2012 (the "Merger Agreement").  These provisions, which collectively preclude any competing offers for Cooper, include: (i) a no-solicitation provision prohibiting the Company from properly shopping itself; (ii) an Expenses Reimbursement Agreement payable by the Company to Eaton for up to $118 million if an unsolicited superior offer materializes and is accepted; and (iii) a three-day matching rights period during which Eaton can match any superior proposal received by the Company.

8.      In an attempt to secure shareholder approval for the unfair Proposed Acquisition, on June 22, 2012, defendants filed with the SEC and disseminated to Cooper shareholders, the materially false and misleading Proxy.  The Proxy, which recommends that Cooper shareholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company.  Among other information, the Proxy omits and/or misrepresents material information in contravention of sections 14(a) and 20(a) of the Exchange Act regarding the fairness opinion provided by Cooper financial advisor, Goldman Sachs & Co. ("Goldman Sachs"), including the data and inputs underlying its valuation analyses.

9.      As explained herein, the foregoing information is material to the impending decision of Cooper shareholders whether or not to vote in favor of the Proposed Acquisition.  As such, defendants' violations of Sections 14(a) and 20(a) of the Exchange Act threaten shareholders with irreparable harm for which money damages are not an adequate remedy.  Thus, plaintiffs seek injunctive relief to ensure that defendants cure their violations of law before Cooper shareholders are asked to vote on the Proposed Acquisition.

10.     To remedy the Individual Defendants' misconduct, plaintiffs seek, *inter alia*: (i) injunctive relief preventing consummation of the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain a transaction that provides the best possible terms for shareholders, and defendants disclose all material information concerning the Proposed Acquisition to Cooper shareholders; (ii) a directive to the Individual Defendants to obtain a transaction which is in the best interests of Cooper shareholders; and (iii) rescission of, to the extent already implemented, the Merger Agreement or any of the terms thereof.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12.     Venue is proper in this District because plaintiffs' claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists.  Eaton, one of the main culprits involved in the wrongdoing alleged herein and the company that is improperly acquiring Cooper, is incorporated in Ohio and is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts within this District.

## PARTIES

13.     Plaintiffs Louisiana Municipal Police Employees Retirement System and Frank E. Waters are, and have been, shareholders of Cooper at all relevant times.

14.     Defendant Cooper is an Irish corporation and a global supplier of electrical components and tools.  Through its two business segments – Energy and Safety Solutions and Electrical Products Group – Cooper develops, manufactures, and sells a wide range of electrical products for use in residential, commercial and industrial construction, and maintenance and repair applications.  Cooper has manufacturing facilities in twenty-three countries and currently employs approximately 25,800 people.  Upon completion of the Proposed Acquisition, Cooper will be a wholly owned subsidiary of Abeiron.  The principal executive offices of Cooper are located at Unit F10, Maynooth Business Campus, Maynooth, Ireland.

15.     Defendant Hachigian is Cooper's President and CEO and has been since May 2005; Chairman of the Board and has been since February 2006; and a director and has been since 2004. Hachigian has also held various other executive positions at Cooper since joining the Company in April 2001.

16.     Defendant Gerald B. Smith is Cooper's Presiding Non-Management Director and has been since at least March 2008; and a director and has been since 2000.

17.     Defendant Linda A. Hill is a Cooper director and has been since 1994.

18.     Defendant Dan F. Smith is a Cooper director and has been since 1998.

19.     Defendant Stephen G. Butler is a Cooper director and has been since 2002.

20.     Defendant Ivor J. Evans is a Cooper director and has been since 2003.

21.     Defendant James J. Postl is a Cooper director and has been since 2003.

22.     Defendant Lawrence D. Kingsley is a Cooper director and has been since 2007.

23.     Defendant Mark S. Thompson is a Cooper director and has been since 2007.

24.     Defendant Eaton is an Ohio corporation and diversified power management company with more than 100 years of experience providing energy-efficient solutions that help its customers effectively manage electrical, hydraulic, and mechanical power. With approximately 72,000

employees, customers in more than 150 countries, and 2011 revenues of $16 billion, Eaton is a global technology leader in electrical components, systems, and services.  Upon completion of the Proposed Acquisition, Eaton will be a wholly owned subsidiary of Abeiron.  Eaton's principal executive offices are located at Eaton Center, Cleveland, Ohio.

25.     Defendant Abeiron is an Irish private limited company.  Upon completion of the Proposed Acquisition, Abeiron will acquire Cooper.

26.     Defendant Comdell is an Irish private limited company and wholly-owned direct subsidiary of Abeiron.

27.     Defendant TBV is a Dutch private company with limited liability and a wholly-owned direct subsidiary of Comdell.

28.     Defendant Turlock is an Ohio corporation and wholly-owned direct subsidiary of TBV.  Upon completion of the Proposed Acquisition, Turlock will merge with and into Eaton ("New Eaton").

29.     The defendants named above in ¶¶15-23 are sometimes collectively referred to herein as the "Individual Defendants."

### THE DEFICIENT SALES PROCESS

30.     According to the Proxy, Eaton was the first company that Cooper considered a potential transaction with.  In connection with discussions that took place on May 3, 2010 between defendant Hachigian, Cooper's Chairman and CEO, and Alexander M. Cutler ("Cutler"), Eaton's Chairman and CEO, Cooper and Eaton entered into a confidentiality agreement on August 9, 2010.

31.     Cooper did not extend the same good-faith attempt to negotiate with other companies however.  According to the Proxy, in November 2011, another interested party, which defendants refer to as Company A in their Proxy, emerged to discuss "possible commercial arrangements and transactions."  Cooper could not even reach an agreement on the terms of a "mutual confidentiality

agreement" with Company A, let alone a good faith negotiation regarding a potential strategic transaction between the two companies.  Moreover, Cooper does not disclose what caused the negotiations relating to the assumingly mutually beneficial confidentiality agreement to fail.

32.     A month later, in December 2011, a representative of another industry participant, which is referred to as Company B in the Proxy, met with the Board and management to discuss a possible business combination between Cooper and Company B.  The Proxy simply states that these discussions did not result in an agreement on the terms of a potential transaction.  Defendants do not disclose the potential benefits offered to Cooper's shareholders in pursuing a potential transaction with Company B.  All Cooper shareholders know about the discussions with Company B was that no agreement was reached.

33.     According to the Proxy, on February 13 and 14, 2012, the Board held a meeting in Houston, Texas.  During this meeting, defendant Hachigian updated the Board concerning the discussions with Company A.  After this meeting, on February 14, 2012, Hachigian called Cutler to further negotiate a business transaction with Eaton.  The Proxy does not mention Hachigian also calling Company A to further any negotiations beneficial to Cooper shareholders.  Moreover, the Proxy does not disclose why  Cooper did not present a counteroffer to Company A if Company A's previous offers were inadequate.

34.     The Proxy states that after receiving an indication of interest from Eaton to pursue an acquisition of Cooper in late February 2012, representatives of Eaton met with representatives of Cooper in Houston, Texas for purposes of conducting due diligence.  Notably, based on the defendants' disclosures in the Proxy, no other interested party, including Company A and B, received access to nonpublic information.

35.     After taking advantage of this exclusive opportunity to conduct due diligence, on April 5, 2012, Cutler sent a letter to defendant Hachigian setting forth a proposal for the acquisition

of Cooper. The letter proposed consideration of $74 per Cooper share, consisting of $32.55 in cash and $41.45 per share in newly issued Eaton common stock. The letter requested that Cooper enter into an exclusivity agreement with Eaton. In addition, Eaton included an incentive in this letter targeted at the Board, stating that it would recommend that two of its members join the New Eaton board of directors if the transaction was successful.

36. According to the Proxy, following receipt of this letter, defendant Hachigian had a series of conversations regarding Eaton's proposal with other members of the Board. The Board recommended that Cooper management should continue to pursue negotiating a transaction with Eaton. The Proxy does not mention Cooper soliciting other potential acquirers in order to determine if they could top Eaton's offer. Moreover, the Proxy also does not mention whether Eaton's proposal triggered Cooper to follow up with Company A or Company B to specifically determine whether any of these interested parties were willing to provide a better offer than Eaton.

37. The Proxy states that defendant Hachigian met with representatives of Company A on April 17, 2012, pursuant to a previously agreed-upon arrangement. Apparently, during the discussion, the representatives of Company A indicated that Company A would prefer an acquisition of only certain of Cooper's businesses, rather than acquiring Cooper as a whole. The Board seemed to reject this proposal, and instead authorized Cooper management to continue discussions with Eaton concerning an acquisition of Cooper by Eaton. Soon thereafter on May 4, 2012, Hachigian informed Company A that the Board was not interested in pursuing Company A's proposal with respect to an asset exchange. The Proxy does not discuss any efforts by Cooper or its Board to seek a counteroffer from Company A that would be more beneficial to Cooper shareholders than Eaton's offer.

38. In spite of Cooper's apparent lack of interest in conducting active good faith negotiations with Company A, the Proxy states that on May 14, 2012, a representative of Company

- 8 -

A contacted defendant Hachigian and indicated that Company A was willing to revise its proposal. The Proxy does not seem to indicate that Hachigian even communicated this potential opportunity to maximize shareholder value to the rest of the Board.  Instead, Hachigian and the rest of the Board continued their exclusive negotiations with Eaton.

39.     According to the Proxy, On May 17 and 18, 2012, defendant Hachigian, Cutler, and Richard H. Fearon, the Vice Chairman and Chief Financial and Planning Officer of Eaton, discussed the pricing of Eaton's previous proposal.  In these discussions, the parties sought to address the effects of the excessive 11.5% decline in the trading price of Eaton since Cutler communicated the proposal on April 5, 2012.  Eaton proposed to increase the cash portion of the consideration and reduce the share portion of the consideration, resulting in a price of $39.15 in cash and 0.761 of a share of New Eaton for each Cooper share.

40.     Then on May 19, 2012, the Proxy states that after a brief discussion, defendant Hachigian and Cutler agreed to a price of $39.15 in cash and 0.77479 New Eaton shares per Cooper share, which had an implied value of $72 per Cooper share based on the closing price of Eaton's shares on May 18, 2012.  Notably, this price was lower than the $74 price offered by Eaton on April 5, 2012.

41.     In addition to agreeing to a price that is lower than the initial proposal communicated by Eaton, Cooper and its Board failed to secure a "collar" in the sale to limit the downward risk to the purchase price.  The Merger Agreement does not contain a "collar" guaranteeing the Company and its shareholders a minimum dollar threshold for their shares under the exchange ratio.  Thus, the Company and its shareholders are at the mercy of the value of Eaton shares at the "effective time" as defined in the Merger Agreement, which may be affected by numerous factors and therefore has little or no relationship to the value of Cooper shares at that time.  A "collar" is particularly important here because defendants were aware of and admit the "decline in the trading price of

- 9 -

Eaton" and the "recent turmoil in global financial markets," all factors that increase the risk for

major stock fluctuation to occur and negatively affect the value Cooper shareholders are receiving.

## THE PROPOSED ACQUISITION

42.     On May 21, 2012, Eaton issued the following press release announcing that the

Individual Defendants had agreed to sell Cooper to Eaton for cash and shares valued at $72 per

Cooper share:

> CLEVELAND & DUBLIN--(BUSINESS WIRE)--Diversified industrial manufacturer Eaton Corporation (NYSE: ETN) ("Eaton") and electrical equipment supplier Cooper Industries plc (NYSE: CBE) ("Cooper") today announced they have entered into a definitive agreement under which Eaton will acquire Cooper in a transaction that will significantly increase the capabilities and geographic breadth of the combined company's power management portfolio and electrical business.

> The announcement required under the Irish Takeover Rules has been made (the "Rule 2.5 Announcement") and is available at www.eaton.com.

> Founded in 1833, Cooper is a leading supplier of electrical equipment with a wide range of electrical products including electrical protection, power transmission and distribution, lighting and wiring components. This suite of electrical products enhances customer energy efficiency and safety across a number of end markets globally.

> Founded in 1911, Eaton is a global power management company. Its electrical business is a global leader in power distribution, power quality, control and automation, power monitoring, and energy management products and services. Eaton is positioned to answer today's most critical power management challenges through its electrical, aerospace, hydraulics and vehicle businesses.

> At the close of the transaction, which is expected in the second half of 2012, Eaton and Cooper will be combined under a new company incorporated in Ireland, where Cooper is incorporated today. The newly created company, which is expected to be called Eaton Global Corporation Plc or a Cooper thereof ("New Eaton"), will be led by Alexander M. Cutler, Eaton's current chairman and chief executive officer.

> "***This compelling combination of Eaton's power distribution and power quality equipment and systems with Cooper's diversified component brands, global reach and international distribution creates a game changer to serve the electrical industry***," said Cutler. "We're excited about bringing together two great companies to create shareholder value and continue our global growth. This combination significantly expands our ability to better serve our customers with their demands for critical energy saving technologies as they address the impact of the world's growing energy needs."

- 10 -

"We are extremely pleased to become part of Eaton's global electrical business," said Kirk Hachigian, chairman and chief executive officer of Cooper. "This combination creates endless opportunities to accelerate growth and serve our global customers through combining technology, distribution, penetrating important vertical industries and entering new emerging markets. The two companies are a perfect fit in every respect."

The combined company would have had historical 2011 revenues of $21.5 billion and EBITDA of $3.1 billion, and it is expected to enhance shareholder value by:

- Leveraging complementary product offerings between Eaton and Cooper's electrical businesses.

- Accelerating long-term growth potential by increasing exposure to attractive end markets and service opportunities.

- Better satisfying customer global demands for energy efficiency and electrical safety.

- Generating approximately $535 million in expected annual synergies by 2016.

The Acquisition is expected to be accretive to operating earnings per share by $0.35 in 2014 and by $0.45 in 2015. Excluding the non-cash expense related to the amortization of intangibles arising from purchase accounting, the Acquisition is expected to be accretive to operating earnings per share by $0.65 in 2014 and by $0.75 in 20152. The Acquisition will be financed with a mixture of cash, debt, and equity.

***Under the terms of the Transaction Agreement, Cooper Shareholders will receive $39.15 in cash and 0.77479 shares of New Eaton for each Cooper share. Based on the Closing Price for Eaton common stock on Friday May 18, 2012, Cooper Shareholders will receive cash and shares valued at $72.00 per share***, representing a premium of 29 percent and a total transaction equity value of approximately $11.8 billion. Eaton Shareholders will receive one share of the new company for each share of Eaton that they own upon closing. The transaction will be taxable, for U.S. federal income tax purposes, to both the Eaton Shareholders and the Cooper Shareholders.

***Eaton Shareholders are expected to own approximately 73 percent of the combined company while legacy Cooper Shareholders are expected to own approximately 27 percent***. Shares of New Eaton will be registered with the U.S. SEC and are expected to trade on the New York Stock Exchange under the ticker symbol ETN.

Eaton has secured a $6.75 billion fully underwritten bridge financing commitment from Morgan Stanley Bank, N.A., Morgan Stanley Senior Funding, Inc. and Citibank, N.A. to finance the cash portion of the Acquisition. Eaton plans to later refinance these bridge borrowings through a new term debt issuance, use of cash on hand, and the possible sale of assets.

43.    That same day, Cooper issued a press release confirming the Proposed Acquisition. As part of their efforts to seek shareholder approval of the Proposed Acquisition, Cooper and the Individual Defendants stated that they would file a Proxy with the SEC.  Cooper urged its shareholders to read the Proxy when it becomes available because it would "CONTAIN IMPORTANT INFORMATION ABOUT EATON, COOPER, NEW EATON, THE TRANSACTIONS AND RELATED MATTERS."  The press release stated, in relevant part:

### Important Additional Information Will Be Filed With The SEC

New Eaton will file with the SEC a registration statement on Form S-4 that will include the Joint Proxy Statement of Eaton and Cooper that also constitutes a Prospectus of New Eaton. Eaton and Cooper plan to mail to their respective shareholders (and to Cooper Equity Award Holders for information only) the Joint Proxy Statement/Prospectus (including the Scheme) in connection with the transactions. ***INVESTORS AND SHAREHOLDERS ARE URGED TO READ THE JOINT PROXY STATEMENT/PROSPECTUS (INCLUDING THE SCHEME) AND OTHER RELEVANT DOCUMENTS FILED OR TO BE FILED WITH THE SEC CAREFULLY WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT EATON, COOPER, NEW EATON, THE TRANSACTIONS AND RELATED MATTERS***. Investors and security holders will be able to obtain free copies of the Joint Proxy Statement/Prospectus (including the Scheme) and other documents filed with the SEC by New Eaton, Eaton and Cooper through the website maintained by the SEC at www.sec.gov. In addition, investors and shareholders will be able to obtain free copies of the Joint Proxy Statement/Prospectus (including the Scheme) and other documents filed by Eaton and New Eaton with the SEC by contacting Investor Relations at Eaton, and will be able to obtain free copies of the Joint Proxy Statement/Prospectus (including the Scheme) and other documents filed by Cooper by contacting Cooper Investor Relations at c/o Cooper US, Inc., P.O. Box 4466, Houston, Texas 77210 or by calling (713) 209-8400.

### FAILURE TO MAXIMIZE SHAREHOLDER VALUE

44.    In order to meet their duties, the Individual Defendants are obligated to explore transactions that will maximize shareholder value, and not structure a preferential deal for themselves.  Due to the Individual Defendants' eagerness to enter into a transaction with Eaton, they failed to implement a process to obtain the maximum price for Cooper shareholders.

45.    As a result of defendants' conduct, Cooper's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in

a sale of their Company. The consideration reflected in the Merger Agreement does not reflect the true inherent value of the Company at the time the Proposed Acquisition was announced.

46. The consideration of $72 per Cooper share offered in the Proposed Acquisition is inadequate. This consideration represents a mere 29% premium to the price at which Cooper stock was trading prior to the announcement of the Proposed Acquisition.

47. The premium offered to Cooper shareholders is especially inadequate when comparing it to the premiums in similar transactions in the same sector over the past five years. Buyers have paid an average premium of over 98% in transactions comparable to the Cooper acquisition, which is far in excess of the 29% premium agreed to by the Company's directors. It is no surprise why an article published by *Seeking Alpha* just days after the announcement of the Proposed Acquisition, titled "Eaton's Acquisition of Cooper Industries Looks Cheap," considered the Proposed Acquisition "great" for Eaton.

48. Moreover, Eaton is not alone in seeing the potential in Cooper. Numerous analysts, just prior to the announcement of the Proposed Acquisition, valued Cooper higher than the proposed purchase price of $72. For example:

      (a)    Analysts with Barclays Capital had a price target of $74 per share on May 2, 2012;

      (b)    Analysts with William Blair & Co. had a price target of $75 per share on May 2, 2012; and

      (c)    Analysts with Oppenheimer & Co. had a price target of $75 per share on May 3, 2012.

49. These analysts had price targets above the proposed purchase price of $72 because they understood the fact that Cooper had positioned itself to have robust and profitable growth. Cooper beat earnings estimates in each of the last four quarters and in eight of the last nine quarters.

Moreover, Cooper beat revenue estimates in each of the last eight quarters.  Cooper's own Chairman of the Board and CEO, defendant Hachigian, touted the Company's success earlier this year when Cooper released its fourth quarter 2011 earnings press release.  In the January 24, 2012 press release, Hachigian stated:

> *Our Company-wide strategic initiatives and proven business model now have delivered eight quarters of double-digit earnings per share growth. Our new product vitality, which represents revenues from sales of products developed in the last three years, was a record 29% of total revenue and our percentage of sales derived from outside the United States reached a record 40%.* Our longer cycle and international businesses produced solid results in the face of macro uncertainty, while demand from non-residential and residential construction markets remains stable.

50.     Even Cutler, Eaton's Chairman of the Board and CEO, acknowledged Cooper's inherent value due to its "diversified component brands, global reach and international distribution." Cutler went so far as to state that Eaton's acquisition of these core Cooper resources would "create[] a game changer."

## THE PRECLUSIVE DEAL PROTECTION PROVISIONS

51.     On May 24, 2012, the Company filed a Form 8-K with the SEC wherein it disclosed the Merger Agreement.  The Merger Agreement reveals that the Board agreed to numerous draconian deal protection devices designed to preclude any competing bids for the Company.

52.     Under section 5.3(a) of the Merger Agreement for example, Cooper is subject to a no-solicitation clause that prohibits the Company from seeking a superior offer for its shareholders. Section 5.3(a) states that:

> Subject to any actions which Cooper is required to take so as to comply with the requirements of the Takeover Rules, Cooper agrees that neither it nor any Subsidiary of Cooper shall, and that it shall use all reasonable endeavours to cause its and their respective Representatives and any person Acting in Concert with Cooper not to, directly or indirectly: (i) solicit, initiate or knowingly encourage any enquiry with respect to, or the making or submission of, any Cooper Alternative Proposal, (ii) participate in any discussions or negotiations regarding a Cooper Alternative Proposal with, or furnish any nonpublic information regarding a Cooper Alternative Proposal to, any person that has made or, to Cooper's knowledge, is considering making a Cooper Alternative Proposal, except to notify such person as to the

- 14 -

existence of the provisions of this Clause 5.3, or (iii) waive, terminate, modify or fail to use reasonable endeavours to enforce any provision of any "standstill" or similar obligation of any person with respect to Cooper or any of its Subsidiaries or, except as otherwise provided in this Agreement, amend or terminate the Cooper Rights Agreement or redeem the rights of Cooper Shareholders thereunder so as to facilitate the making of a Cooper Alternative Proposal (provided that Cooper shall not be required to take, or be prohibited from taking, any action otherwise prohibited or required by this subclause (iii) if the Cooper Board determines in good faith (after consultation with Cooper's legal advisors) that such action or inaction would be reasonably likely to be inconsistent with the directors' fiduciary duties under applicable Law). Cooper shall, and shall cause its Subsidiaries and its and their respective Representatives to, immediately cease and cause to be terminated all existing discussions or negotiations with any person conducted heretofore with respect to any Cooper Alternative Proposal, or any enquiry or proposal that may reasonably be expected to lead to a Cooper Alternative Proposal, request the prompt return or destruction of all confidential information previously furnished in connection therewith and immediately terminate all physical and electronic dataroom access previously granted to any such person or its Representatives.

53.     Though the Merger Agreement ostensibly has a purported "fiduciary out" provision that allows the Company to negotiate with other bidders, in order for Cooper to negotiate with any other suitors, the potential acquirer would first have to make an unsolicited superior offer.  Without access to non-public information, which the Company is prevented from offering under the Merger Agreement prior to the receipt of an offer that the Company reasonably expects to lead to a superior deal, no other bidder will emerge to make such an offer.

54.     Section 5.3(i) of the Merger Agreement conveys upon Eaton unlimited information and matching rights should Cooper receive any other acquisition proposal, which is defined so broadly as to cover virtually any offer to buy any part of the Company.  Even if the Company does receive an unsolicited offer, it is required to provide all information regarding that offer to Eaton within twenty-four hours, whereupon Eaton will have unlimited opportunities to adjust its offer to prevent the Board from changing its recommendation to shareholders.

55.     Furthermore, Cooper is subject to another preclusive lock-up provision based on the Expenses Reimbursement Agreement the Company entered into with Eaton.  This Expenses Reimbursement Agreement requires Cooper to pay to Eaton an amount equal to all documented,

specific, and quantifiable third-party costs and expenses incurred by Eaton, if the Proposed Acquisition is terminated by Cooper in order to enter into a superior proposal, or by Eaton if Cooper accepts a superior proposal. Even though the gross amount payable to Eaton pursuant to the Expenses Reimbursement Agreement is capped at 1% of the total value of the issued share capital of Cooper that is the subject of the Proposed Acquisition, this amounts to a potential $118 million liability.

56.    The provisions above, which will serve to unreasonably deter and discourage superior offers from other interested parties, were agreed to by the Individual Defendants to help secure the personal benefits and unfair profits afforded to them through the Proposed Acquisition and all but ensure that no other bidder steps forward to submit a superior proposal.

### THE MATERIALLY MISLEADING PROXY

57.    In order to secure shareholder approval of this unfair deal, defendants filed the materially misleading Proxy with the SEC on June 22, 2012. The Proxy, which recommends that Cooper's shareholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the unfair sale process, the unfair consideration, and the true intrinsic value of the Company. Specifically the Proxy omits/or misrepresents the material information set forth below in contravention of Sections 14(a) and 20(a) of the Exchange Act and the Board's duty of candor.

58.    ***The Sales Process Leading to the Proposed Acquisition.*** In the Background of the Transaction section on pages 62-68 of the Proxy, it fails to disclose: (i) how the Board derived $72 per share as an adequate price on May 19, 2012, given the fact that on April 5, 2012, Eaton offered $74 per Cooper share; and (ii) why the Board decided against soliciting other potential acquirers. Without the information set forth above, shareholders are unable to determine the sufficiency of the

process that led to the Proposed Acquisition and whether the Board took all steps to maximize shareholder value.

59. ***Goldman Sachs's Selected Companies Analysis.*** In the discussion of Goldman Sachs's Selected Companies Analysis on page 88 of the Proxy, it fails to disclose: (i) the summary statistics for each of the comparable companies; (ii) what criteria were used to select the companies and multiples Goldman Sachs considered; (iii) the observed multiples for each of the comparable companies; (iv) the individual ranges of value derived using management's estimates and publicly available research analyst estimates; and (v) the selected reference ranges applied (if any) to the Company's earnings before interest, taxes, depreciation, and amortization ("EBITDA") and earnings per share ("EPS") for its trailing twelve months as well as calendar year 2011 in the analysis. This information is material because without the information set forth above, shareholders are unable to independently assess whether the implied prices per share derived by Goldman Sachs as set forth in the Proxy are based on an applicable set of companies and multiples. This is especially true given that the analysis discloses that "none of the selected companies is entirely comparable to Cooper or Eaton." Accordingly, shareholders are unable to independently assess whether Goldman Sachs's analysis, as set forth in the Proxy, is an adequate measure of this value assessment and what weight, if any, to place on the fairness opinion in deciding how to vote on the Proposed Acquisition.

60. ***Goldman Sachs's Discounted Cash Flow Analysis.*** In the description of Goldman Sachs's Discounted Cash Flow Analysis on page 89 of the Proxy, it fails to disclose: (i) the inputs and assumptions used by Goldman Sachs to derive the range of discount rates used in its analysis, which appear to be particularly excessive at 9.5% to 10.5% and 10% to 11%; (ii) the inputs and assumptions used by Goldman Sachs to derive the range of EBITDA multiples used in its analysis of 8.0x to 10.5x and 5.8x to 7.5x; (iii) the definition of "unlevered free cash flows;" (iv) what Cooper's unlevered free cash flows were or any inputs necessary to derive such figures; (v) the five-year

EBITDA average for each business segment used by Goldman Sachs to calculate the terminal value; (vi) what other companies with growth and margin profiles similar to those of the Company's electrical products and diversified industrials business did Goldman Sachs review to select the range of multiples for its analysis and what were the multiples at those companies; and (vii) whether and how stock based compensation was considered in the analysis.  Because the Discounted Cash Flow Analysis is very sensitive to its inputs, specifically the EBITDA multiples and discount rates selected to calculate estimated terminal values, this information is critical to shareholders' understanding of how the analysis was performed, whether that analysis was performed properly, and in turn, what weight, if any, to place on Goldman Sachs's Discounted Cash Flow Analysis (and its fairness opinion generally) when determining whether to vote for the Proposed Acquisition.

61. ***Goldman Sachs's Selected Transactions Analysis.***  In the description of Goldman Sachs's Selected Transactions Analysis on page 89 of the Proxy, it fails to disclose: (i) the financial metrics and/or multiples used for each of the selected precedent transactions; and (ii) the selected reference ranges (if any) applied to Cooper's twelve months trailing EBITDA.  Without the information set forth above, shareholders are unable to independently assess whether Goldman Sachs's analysis, as set forth in the Proxy, is an adequate measure of this value assessment and what weight, if any, to place on the fairness opinion in deciding how to vote on the Proposed Acquisition.

62. ***Value of the Company***. In Goldman Sachs's Present Value of Future Stock Price section on pages 90-91 of the Proxy, it fails to disclose the financial projections for each management case for years 2012 through 2014 by segment of: (i) revenue; (ii) adjusted EBITDA; (iii) EBITDA; (iv) adjusted operating income; (v) operating income; (vi) stock-based compensation expense; and (vii) unlevered free cash flow. Without the information set forth above, shareholders are unable to determine the fairness of the consideration in the Proposed Acquisition.

63.     The Individual Defendants were aware of their duty to disclose the foregoing material information in the Proxy, and acted with at least negligence in failing to ensure that this material information was disclosed.  Absent disclosure of this material information, shareholders are unable to make an informed decision about whether to vote in favor of the Proposed Acquisition and are, thus, threatened with irreparable harm warranting injunctive relief.

**UNFAIR DEALING**

64.     Because the Individual Defendants dominate and control the business and corporate affairs of Cooper and have access to material, non-public information concerning Cooper's financial condition and business prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Cooper.  Therefore, it is inherently unfair for the Individual Defendants to execute and pursue any merger or acquisition under which they will reap disproportionate benefits to the exclusion of obtaining the best shareholder value reasonably available.  Nonetheless, the Proposed Acquisition represents an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of the Class (as defined herein) by denying the Class members their shareholders' rights by selling Cooper via an unfair process and at an inadequate price.  Accordingly, the Proposed Acquisition will benefit the Individual Defendants at the expense of Cooper shareholders.

65.     Instead of attempting to negotiate an agreement reflecting the best consideration reasonably available for Cooper shareholders who they are duty-bound to serve, the Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Acquisition to meet their own personal needs and objectives by agreeing to sell the Company to a buyer that would retain members of the Company's Board going forward.  Indeed, the Board was encouraged to approve Eaton's proposal given the fact that Eaton promised them two

seats on New Eaton's board of directors if the transaction was successful.  As stated in the Form 8-K

Cooper filed with the SEC on May 24, 2012:

> Pursuant to the Transaction Agreement, effective as of the closing of the Transactions, *the directors of New Eaton will be* (i) the directors of Eaton as of immediately prior to the closing and (ii) *two additional directors, who shall be members of the Cooper board of directors as of the date of the Transaction Agreement*, which additional directors are to be selected by the governance committee of the Eaton board of directors.

66.     In light of the foregoing, the Individual Defendants must, as their obligations require:

- Withdraw their consent to the acquisition of Cooper and allow the shares to trade freely - without impediments, including the no solicitation provision, matching rights, and Expenses Reimbursement Agreement;

- Act independently so that the interests of Cooper public stockholders will be protected;

- Adequately ensure that no conflicts of interest exist between defendants' own interests and their obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Cooper public stockholders; and

- Solicit competing bids to Eaton's offer to ensure that the Company's shareholders are receiving the maximum value for their shares.

## CLASS ACTION ALLEGATIONS

67.     Plaintiffs bring this action for themselves and on behalf of all holders of Cooper

common stock which have been or will be harmed by the conduct described herein (the "Class").

Excluded from the Class are the defendants and any individual or entity affiliated with any

defendant.

68.     This action is properly maintainable as a class action.

69.     The Class is so numerous that joinder of all members is impracticable.  According to

Cooper's SEC filings, there were more than 159 million shares of Cooper common stock outstanding

as of May 21, 2012.

- 20 -

70.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     whether the Proxy contains material misstatements or omissions in violation of Sections 14(a) and 20(a) of the Exchange Act;

(b)     whether the Individual Defendants have oppressed Cooper shareholders in connection with the Proposed Acquisition by: (i) failing to take steps to maximize the value of Cooper to its public shareholders; (ii) failing to properly value Cooper and its various assets and operations; and (iii) ignoring and not protecting Cooper shareholders against the numerous conflicts of interest; and

(c)     whether plaintiffs and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

71.     Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs do not have any interests adverse to the Class.

72.     Plaintiffs have retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

73.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

74.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

75.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

**Against the Individual Defendants, Cooper, and Eaton for Violations of**
**Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder**

76.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

77.     The Individual Defendants, Cooper, and Eaton disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78.     The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants, Cooper, and Eaton.  It misrepresented and/or omitted material facts, including material information about the actual intrinsic value of the Company.

79.     In so doing, the Individual Defendants, Cooper, and Eaton made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

80.     The Individual Defendants, Cooper, and Eaton were at least negligent in filing the Proxy with these materially false and misleading statements.

81.     The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

82.     By reason of the foregoing, the Individual Defendants, Cooper, and Eaton have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

83.     Because of the false and misleading statements in the Proxy, plaintiffs are threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act

84.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

85.     The Individual Defendants acted as controlling persons of Cooper within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as officers and/or directors of Cooper, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

86.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

87.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   The Proxy at issue contains the unanimous recommendation

of each of the Individual Defendants to approve the Proposed Acquisition.  They were, thus, directly involved in the making of the Proxy.

88.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Acquisition. The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from the directors.  By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

89.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.

## COUNT III

### Claim for Oppression Under Section 205 of the Irish Companies Act 1963 Against the Individual Defendants

90.     In accordance with Section 205 of the Irish Companies Act of 1963, any shareholder who complains that the affairs of a company are being conducted or that the powers of the directors of a company are being exercised in a manner oppressive to him or any of the members (including himself), or in disregard of his or their interests as members, may apply to the Court for an order under this section.

91.     If, on such application, the Court is of opinion that the company's affairs are being conducted or the directors' powers are being exercised as aforesaid, the Court may, with a view to bringing to an end the matters complained of, make such order as it thinks fit, whether directing or prohibiting any act or cancelling or varying any transaction or for regulating the conduct of the company's affairs in future, or for the purchase of the shares of any members of the company by

other members of the company or by the company and in the case of a purchase by the company, for the reduction accordingly of the company's capital, or otherwise.

92.     It is unlawful under Irish law for the directors to disregard the interests of a minority of the member's interests (as members), even where the Proposed Acquisition put forward is put forward in good faith, and such disregard will amount to oppression under Irish law, and to a remedy against the Board of Cooper under Irish company law for the oppressive actions of the Board.

93.     Under Irish law, courts are provided with the authority to enjoin the sale of a company as oppressive to shareholders where, as here, the Board is attempting to sell the Company at less than fair value, is acting in breach of its duties, and is conflicted in its interests.

94.     As demonstrated by the allegations above, the Individual Defendants have acted in an oppressive manner to the shareholders of Cooper because, among other reasons:

    (a)     they failed to take steps to maximize the value of Cooper to its public shareholders;

    (b)     they failed to properly value Cooper and its various assets and operations; and

    (c)     they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Acquisition.

95.     Because the Individual Defendants dominate and control the business and corporate affairs of Cooper, and are in possession of or have access to private corporate information concerning Cooper's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Cooper which makes it inherently unfair and oppressive for them to pursue and recommend any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

96.     As a result of the Individual Defendants' oppressive and unlawful actions, plaintiffs and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Cooper's assets and operations.  Unless the Proposed Acquisition is enjoined by the Court, the Individual Defendants will continue to act in an oppressive manner to plaintiffs and the members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition terms, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand injunctive relief, in their favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Declaring and decreeing that the Merger Agreement is unlawful and unenforceable;

C.     Declaring and decreeing that defendants have acted and are acting in an oppressive manner to the Company's shareholders;

D.     Rescinding, to the extent already implemented, the Merger Agreement;

E.     Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company: (i) adopts and implements a procedure or process reasonably designed to provide the best possible value for shareholders; and (ii) amends the Proxy so as to provide Cooper shareholders with all material information concerning the Proposed Acquisition as required by the Exchange Act;

F.     Directing the Individual Defendants to commence a sale process that is reasonably designed to obtain a transaction which is in the best interests of Cooper shareholders;

G.     Imposition of a constructive trust, in favor of plaintiffs and members of the Class, upon any benefits improperly received by defendants as a result of their wrongful conduct;

H.      Awarding plaintiffs the costs and disbursements of this action, including reasonable

attorneys' and experts' fees; and

I.      Granting such other and further equitable relief as this Court may deem just and

proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, plaintiffs hereby demand a trial by jury on all

issues so triable.

DATED:  August 1, 2012                     LANDSKRONER GRIECO MERRIMAN, LLC
                                           JACK LANDSKRONER


                                                    s/Jack Landskroner
                                           _____
                                           JACK LANDSKRONER (0059227)
                                           DREW LEGANDO (0084209)
                                           1360 West 9th Street, Suite 200
                                           Cleveland, OH  44113
                                           Telephone: (216) 522-9000
                                           Facsimile:  (216) 522-9007
                                           E-mail: jack@lgmlegal.com
                                           E-mail: drew@lgmlegal.com

                                           Counsel for Plaintiffs

                                           ROBBINS UMEDA LLP
                                           BRIAN J. ROBBINS
                                           STEPHEN J. ODDO
                                           ARSHAN AMIRI
                                           EDWARD B. GERARD
                                           JUSTIN D. RIEGER
                                           600 B Street, Suite 1900
                                           San Diego, CA 92101
                                           Telephone: (619) 525-3990
                                           Facsimile: (619) 525-3991
                                           E-mail: brobbins@robbinsumeda.com
                                           E-mail: soddo@robbinsumeda.com
                                           E-mail: aamiri@robbinsumeda.com
                                           E-mail: egerard@robbinsumeda.com
                                           E-mail: jrieger@robbinsumeda.com

BRANNON LAW FIRM, LLC
PAUL M. BRANNON
3500 North Hullen Street
Metairie, LA  70002
Telephone: (504) 456-8600
Facsimile: (504) 456-8697
Email: pmb@brannonlawfirm.com

O'BELL, L.L.C.
ERIC J. O'BELL
3500 North Hullen Street
Metairie, LA  70002
Telephone: (504) 456-8600
Facsimile: (504) 456-8653
Email: eric@ghwlegal.com

Counsel for Plaintiff Louisiana Municipal Police
Employees Retirement System

ROBBINS GELLER RUDMAN
   & DOWD LLP
RANDALL J. BARON
A. RICK ATWOOD, JR.
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
Email: randyb@rgrdlaw.com
Email: ricka@rgrdlaw.com
Email: dwissbroecker@rgrdlaw.com

THE BRISCOE LAW FIRM, PLLC
WILLIE C. BRISCOE
8117 Preston Road, Suite 300
Dallas, TX  75225
Telephone:  214/706-9314
214/706-9315 (fax)
Email: wbriscoe@thebriscoelawfirm.com

POWERS TAYLOR LLP
PATRICK W. POWERS
Campbell Centre II
8150 North Central Expressway, Suite 1575
Dallas, TX  75206
Telephone:  214/239-8900
214/239-8901 (fax)

Counsel for Plaintiff Frank E. Waters

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2012, a copy of foregoing AMENDED COMPLAINT FOR VIOLATIONS OFTHE SECURITIES EXCHANGE ACT OF 1934 AND OPPRESSION was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served via approved methods of service. Parties may access this filing through the Court's system.

s/ Jack Landskroner
_____
Jack Landskroner (0059227)

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAW

Louisiana Municipal Police Employees Retirement System ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.      Plaintiff has reviewed the Class Action Complaint, has authorized its filing, and has retained Brannon Law Firm, O'Bell, LLC and Robbins Umeda LLP as counsel in this action for all purposes.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Brannon Law Firm, O'Bell, LLC or Robbins Umeda LLP or in order to participate in any private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.      Plaintiff has sought to serve or served as a representative party for a class in numerous actions filed under the federal securities laws within the past three years pursuant to its fiduciary duty to its pension fund contributors.  Plaintiff is a sophisticated investor with experience in brining this sort of action.

5.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

6.      The undersigned represents and warrants that at all times relevant, she was and is currently the Director of the Louisiana Municipal Police Employees Retirement System ("MPERS") and that she is fully authorized to enter into and execute this certification on behalf of Plaintiff.

7.      I declare under penalty of perjury that the foregoing is true and correct.  Executed this _30th_ day of _July_____, 2012.

Kathy Bourque

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

FRANK WATERS ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 5-2-01 | 1372 | #18.50 |
|  |  |  |
|  |  |  |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

COOPER INDUSTRIES

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __/__ day of __A U G__ , 2012.

_____
FRANK WATERS

- 2 -